T.C. Memo. 2006-69

UNITED STATES TAX COURT

HOMER L. RICHARDSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

GLORIA M. RICHARDSON, Petitioner <u>v</u>.
COMMISSIONER OR INTERNAL REVENUE, Respondent

Docket Nos. 16794-03, 16795-03.          Filed April 11, 2006.

        Ps established a tiered trust arrangement and
transferred to the entities their assets, including
their personal residence and lifetime services.

        <u>Held</u>:  The trusts implemented and used by Ps
during 1996 and 1997 should be disregarded for tax
purposes as sham entities lacking in economic
substance, with resultant inclusion by Ps of income
reported by the trusts, recomputation of business
deductions allowable to Ps, and liability for self-
employment taxes.

        <u>Held</u>, <u>further</u>, Ps are not entitled to capital loss
amounts claimed for both years and must recognize a
capital gain in 1997.

   *Held*, *further*, P H is liable for civil fraud penalties pursuant to sec. 6663, I.R.C., for 1996 and 1997.

   *Held*, *further*, P H is liable for an accuracy-related penalty pursuant to sec. 6662(a), I.R.C., with respect to that portion of the deficiency for 1996 that is not attributable to fraud.

   *Held*, *further*, the statute of limitations does not bar assessment of liabilities for 1996 and 1997.

   *Held*, *further*, P W is not entitled to relief pursuant to sec. 6015, I.R.C., for the years 1996 and 1997.

Robert Alan Jones, for petitioners.

Richard J. Hassebrock and John A. Freeman, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, *Judge*:  Respondent determined the following deficiencies and penalties with respect to petitioners' Federal income taxes for the 1996 and 1997 taxable years:[1]

Homer L. Richardson - Docket No. 16794-03

| | | Penalties | |
| Year | Deficiency | Sec. 6662 | Sec. 6663 |
| 1996 | $164,442 | $67.80 | $123,077.25 |
| 1997 | 123,848 | | 92,886.00 |

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

Gloria M. Richardson - Docket No. 16795-03

| Year | Deficiency |
|------|------------|
| 1996 | $164,442 |
| 1997 | 123,848 |

The principal issues for decision in these consolidated cases are:

(1) Whether trusts implemented and used by petitioners during 1996 and 1997 should be disregarded for tax purposes as sham entities lacking in economic substance, with resultant (a) inclusion by petitioners of income reported by the trusts; (b) recomputation of business deductions allowable to petitioners; and (c) liability for self-employment taxes and entitlement to corresponding deductions.

(2) Whether petitioners' reported capital loss for both tax years should be adjusted.

(3) Whether there exist underpayments due to fraud for 1996 and 1997 such that petitioner Homer L. Richardson (Mr. Richardson) is liable for civil fraud penalties pursuant to section 6663.

(4) Whether Mr. Richardson is liable for an accuracy-related penalty pursuant to section 6662(a) with respect to that portion of the deficiency for 1996 that is not attributable to fraud.

(5) Whether the statute of limitations bars assessment of liabilities for 1996 and 1997.

(6) Whether petitioner Gloria M. Richardson
(Mrs. Richardson) is entitled to relief pursuant to section 6015 for the years 1996 and 1997.
Certain additional adjustments to petitioners' Social Security income and personal exemptions are computational in nature and will be resolved by our holdings on the foregoing issues.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference. At all relevant times throughout the years in issue, at the time the petitions in these cases were filed, and at the time of trial, petitioners resided at 758 Quailwoods Drive, Loveland, Ohio 45140.

Personal Background

Petitioners are husband and wife and have four adult children: Laura Morris, Karen Cahill, Susan Richardson, and Barton Richardson. Mrs. Richardson is trained as an x-ray technician. In the past she worked as a medical assistant but apparently ceased her employment in or about 1997 in conjunction with undergoing chemotherapy treatments for cancer.

Mr. Richardson graduated from the University of Missouri in 1958, earning a 4-year business degree in marketing. In connection with obtaining that degree, Mr. Richardson completed two courses in accounting. Since graduating, Mr. Richardson has

been engaged in a number of business ventures.  He was employed for 12 years in a supervisory capacity over several Super-X drug stores located across Ohio, Indiana, and Kentucky.  In approximately 1979, he founded a tool and die business, which he ran for about 3 years.  Mr. Richardson obtained licenses to sell insurance and mutual funds in around 1983 and maintained those licenses until allowing them to expire sometime in the 1996 to 1998 timeframe.  Each license required Mr. Richardson to attend approximately 40 hours of classes and to pass an examination. From 1993 to 1996, Mr. Richardson was self-employed as an insurance salesman, operating through a sole proprietorship under the name Benefit Planning Services.

Trust Implementation and Operation

In 1995, petitioners met with representatives from the Aegis Company (Aegis), an entity that promoted both domestic and foreign trust packages.[2]  Michael Vallone was the executive director of Aegis, Robert Hopper was the managing director, and Edward Bartoli (Mr. Bartoli)[3] was the legal director. Petitioners purchased a multitrust package from Aegis in 1996 for

---

[2] Use of "trust", "trustee", "beneficiary", and related appellations is for convenience only and is not intended to impart any legal significance with respect to characterization for Federal tax purposes.

[3] The parties do not dispute that Mr. Bartoli, although formerly admitted to practice law in Illinois, was disbarred subsequent to the years in issue in these cases.

$5,000.  In June of 1996, Mr. Richardson applied for and received from the Internal Revenue Service (IRS) two employer identification numbers, one under the name of HG Asset Management Trust and the other under the name of HG Richardson Charitable Trust (HGRCT).  Each application stated that the respective business was started or acquired on April 1, 1996.  Also in 1996, Mr. Richardson ceased operations under the name Benefit Planning Services and thereafter conducted any sole proprietorship activities under the name Asset Protection Services.

On August 7, 1996, Mrs. Richardson transferred all of her assets, real and personal, as well as her right to receive future income and "exclusive use of my lifetime services (exception being that of an employee situation)", to Mr. Richardson, in exchange for $10.  On August 8, 1996, petitioners purportedly transferred their personal residence on 758 Quailwoods Drive to HG Asset Management Company (HGAMC).[4]  Petitioners continued to reside at that location following the transfer.

By a trust instrument dated August 17, 1996, James Quay (Mr. Quay) as creator, Mr. Richardson as investor, and Mr. Quay and Mrs. Richardson as acceptors and initial directors established HGAMC as a "Common Law Business Organization".  Mr. Quay was an attorney whom Mr. Richardson had met at an Aegis

---

[4] The parties stipulated this fact, but because no documents dated Aug. 8, 1996, related to the transfer are contained in the record, any specifics and/or incongruities remain unexplained.

training presentation earlier in the year and who apparently prepared the trust documents. The directors were given broad authority to deal with trust property in their discretion for the benefit of HGAMC. The trust instrument further provided: "A Minute of Resolutions of the Board of Directors authorizing what they determine to do or have done shall be evidence that such an act is within their power."

Also on August 17, 1996, a management contract was entered between HGAMC and Mr. Richardson's sole proprietorship Asset Protection Services. The agreement called for HGAMC to provide management services to the sole proprietorship, through the services of Mr. Richardson, in return for a "One time set up fee" of $40,000, a "Monthly management fee" of $12,000, and a charge for "Strategic and Tactical Planning for 1997" of $10,000. The agreement was executed by Mr. Richardson on behalf of Asset Protection Services and by both Mr. and Mrs. Richardson as directors of HGAMC.[5] The majority of the stated fees were never paid. The contract was renewed on its anniversary in both 1997 and 1998 for compensation to be paid to HGAMC of $5,000 annually.

Initial actions undertaken by HGAMC were memorialized in the minutes of the entity's first board meeting on August 17, 1996. The trust instrument and the minutes reflect and reference the intended conveyance by Mr. Richardson to HGAMC of real and

---

[5] The Court notes that as of Aug. 17, 1996, Mr. Richardson had not been appointed as a director of HGAMC.

personal property as well as the exclusive use of all his lifetime services. The minutes also show that the directors were authorized to seek an employer identification number for HGAMC by substituting the word "Trust" for "Company" in the entity's name. On August 19, 1996, petitioners opened two checking accounts at Fifth Third Bank, one in the name of Asset Protection Services and one in the name of HGRCT. At some time prior to August of 1996, a checking account at Fifth Third Bank had been opened in the name of HGAMC. Petitioners held sole signatory authority over all three of these accounts.

A second meeting of the HGAMC board was held on August 20, 1996. On that date, Mr. Richardson transferred to HGAMC all of his assets, real and personal, as well as his right to receive future income and the exclusive use of his lifetime services ("exception being that of an employee status"). The conveyance expressly included all that he had received from Mrs. Richardson under her August 7, 1996, assignment. HGAMC then issued to Mr. Richardson a certificate representing all of the beneficial interest; i.e., 100 units, in HGAMC. On the same August 20, 1996, date, Mr. Richardson returned the certificate to HGAMC, asking the directors to cancel it and to reissue the units as follows: 40 units to Mr. Richardson; 50 units to Mrs. Richardson; and 10 units to HGRCT. New certificates were issued to that effect. According to the terms of the certificates, benefits conveyed by the units "[consisted] solely of the

distributions of income from the earnings of the assets as distributed by the action of The Directors and nothing more."

Also at the August 20 meeting, Mr. Richardson was appointed a director of HGAMC and was given the title of Executive Director. Mrs. Richardson was appointed as Executive Secretary of HGAMC. HGAMC contracted for the services of petitioners in those executive roles, in exchange for living accommodations, expenses incident to company business (e.g., transportation, office, entertainment, and meeting expenses), life and medical insurance, and consultant fees.

By a trust instrument likewise dated August 20, 1996, HGAMC created HGRCT. Petitioners executed the document both as directors of HGAMC and as trustees of HGRCT. Petitioners did not obtain section 501(c)(3) status for HGRCT.

On August 23, 1996, Mr. Quay submitted, and petitioners in their capacities as directors of HGAMC accepted, his resignation as a director of HGAMC. On August 29, 1996, petitioners conducted board meetings for both HGAMC and HGRCT. At the HGAMC meeting, petitioners' four children were named as successor directors, in the order listed, and as successors in equal shares to petitioners' beneficial interests. At the HGRCT meeting, HGRCT received 10 units of beneficial interest in HGAMC and in exchange issued to HGAMC all units of beneficial interest; i.e., 100, in HGRCT. At a second meeting of the HGRCT on September 1,

1996, Mr. Richardson was appointed as Executive Trustee, and Mrs. Richardson was appointed as Executive Secretary.

Petitioners thereafter opened several additional bank accounts with respect to the various entities discussed above, all at Lebanon Citizens National Bank. For example, between September of 1996 and November of 1997, accounts were established under the following names: (1) HG Asset Management Co., c/o of Homer Richardson; (2) Homer Richardson d.b.a. Aegis Co., later renamed HG Asset Management Co. d.b.a. Aegis Co.; (3) Homer Richardson d.b.a. Asset Protection Co.; and (4) HG Richardson Charitable Trust. Petitioners had signatory authority over each of these accounts, and in a few instances one of their children was given signatory authority as well. Records also show that certain of the accounts previously established at Fifth Third Bank were closed in October of 1996.

Minutes from numerous HGAMC board meetings from August of 1996 through May of 2000 reflect activities of the entity authorized by petitioners in their capacities as directors. Mrs. Richardson participated in each of these meetings along with her husband and signed the minutes and resolutions so generated. Several of the matters garnering the board's attention involved petitioners' transportation and residence. On October 14, 1996, the directors approved the purchase by HGAMC of a 1996 Mercury Grand Marquis for $19,950 "to be provided to the Executive Director". Mr. Richardson testified that the car was acquired

with funds from an account held in the name of HGAMC but was titled in his name.

From their respective inceptions, Mr. Richardson's sole proprietorships, HGAMC, and HGRCT were operated out of petitioners' residence on Quailwoods Drive. Resolutions specified that particular business operations of HGAMC would be conducted at its "headquarters" on Quailwoods Drive and required the presence of the Executive Director at the site to oversee maintenance and security. In addition, through a series of resolutions, HGAMC was authorized to, and did, contract for the remodeling of the company headquarters.

With respect to business conducted elsewhere, minutes show that the directors "were authorized to travel to Nashville, Indiana for purposes of looking at different land investment opportunities." Later, a director's meeting attended by petitioners' four children was held at Mike Fink's Restaurant in Covington, Kentucky, "for the purpose of discussing duties of successor directors with those appointed as successor directors". At that meeting, "It was dedided [sic] that more time should be devoted to training & that a two (2) day meeting should be scheduled for Brown County State Park in the future". The tab for the meal was $247.38.

Matters related to tax issues, from administrative functions related to preparation of the entities' returns to intentions or positions on tax topics, were likewise addressed at board

meetings.  As an example of the latter, minutes of the HGAMC

board meeting held on June 27, 1997, read as follows:

> The Executive Director, Homer L. Richardson as
> instructed by the Board of Directors made available to
> the Board of Directors research from the Aegis Company,
> Court Cases and legal opinions regarding IRS Notice 97-
> 24.
>
> Mr. Richardson provided a report from the Aegis Company
> that addressed each paragraph of IRS Notice 97-24 in
> which it was pointed out that Notice 97-24 was
> concerned with I.R.C. Sec 671-679 as it pertains to
> grantor trusts and that when a person attempts to apply
> business trust procedures of tax reduction to an
> "ordinary trust" the trust is labeled by the IRS as an
> "abusive trust".  The report concluded that 97-24 is
> not addressing legitimate business trusts.
>
> Mr. Richardson also provided a copy of American
> Jurisprudence Second Edition volume 13 Business Trusts,
> Excerpts from Executive's Business Law Section
> regarding Business Trusts, a report from George M.
> Turner, M.S. J.D. regarding the legal foundation of the
> Business Trust and taxation of a Business Trust and a
> report from the Yale law [sic] Journal titled the trust
> as an instrument of Commerce.
>
> The materials supplied, the legal opinions and the
> research conducted regarding business trusts do not
> support the position that the Aegis business trust is
> the kind of trust that is addressed in IRS Notice 97-
> 24.

In addition to personally implementing an Aegis multitrust

package, Mr. Richardson also became involved in the promotion and

sale of the Aegis system.  Beginning in 1996, Mr. Richardson sold

Aegis trust packages through Asset Protection Services, and it

was this business that was managed by HGAMC under the contractual

arrangement detailed above.  Generally, HGAMC would retain a

percentage of the sales price of a trust package as a commission

from Aegis.  Mr. Richardson took a 3-day training course from

Mr. Bartoli of Aegis in connection with these activities.  The

record contains several examples from the 1998 to 1999 time

period of announcements for trust workshops that reflect the

nature of Mr. Richardson's promotional efforts in this regard.

For instance, in a 1999 letter addressed to agents working

for State Farm Insurance encouraging them to attend workshops

scheduled for New Orleans, Louisiana; and Mobile, Alabama;

Mr. Richardson introduced himself and his business as set forth

below:

> My name is Homer Richardson, and for the past five
> years, as a representative of the Aegis Company, I have
> been conducting workshops throughout the country
> teaching State Farm Agents, doctors, dentists, and
> other self employed individuals, how to protect their
> assets from lawsuit judgments and dramatically reduce
> their income taxes.
>
> This workshop is not open to the general public and is
> by invitation only.  We teach self employed individuals
> how to operate a business using a special kind of
> trust.  This special trust is a business device that
> has several names.  It has been referred to as a Blind
> Trust, an Unincorporated Business Organization, a
> Contractual Business Organization, and a Common Law
> Business Organization, just to name a few.  We refer to
> this special trust as a CBO.  However, the IRS refers
> to all of these entities as Business Trusts.

This and similar announcements for the introductory workshop

directed toward self-employed professionals consistently tout as

benefits of the business trust system the ability to:  Legally

reduce Federal and State income taxes "70% or More"; eliminate

Federal estate taxes no matter the size of the estate; sell a

business or other assets and pay no capital gain taxes; and protect personal assets from lawsuit judgments.

Mr. Richardson participated as a featured speaker at various of these events. For example, with respect to workshops to be conducted in 1999 in Lexington, Kentucky; Indianapolis, Indiana; Toledo, Ohio; and Cincinnati, Ohio; the invitation highlighted as speakers:

> Wilson Graham: Former State Farm Insurance employee, conducted audits and tax reports for Corporate Office. Mr. Graham also was a controller and vice-president for a large insurance company in Ohio. for [sic] the past 19 years Graham & Associates has provided tax planning and accounting services for hundreds of State Farm Insurance Agents and other self-employed individuals in several states. For the past four years, Mr. Graham has conducted Tax Workshops and provided supporting tax services.

> Homer L. Richardson: Mr. Richardson, as Executive Director of the HG Asset Management Company, specializes in asset protection, tax engineering, and wealth accumulation. For the past seven year [sic], Mr. Richardson has conducted Business Trust workshops throughout the country teaching people how to protect their assets from lawsuit judgments and reduce taxes. Mr. Richardson is extremely knowledgeable regarding Business Trusts and is a highly sought after speaker. His workshops are in high demand and filled with information about the Business Trust and their [sic] financial advantages.

These announcements generally direct that registrations be sent, and checks made payable, to HGAMC, or Trust Management Services (further explained below).

The record also contains an example of an announcement for an advanced business trust workshop sponsored by HGAMC in Ohio in 1999.[6]  Mr. Richardson sent out an invitation stating:

> I am writing to let you know about an ADVANCED BUSINESS TRUST WORKSHOP that HG Asset Management Company is sponsoring.  This workshop will be conducted by Mike Vallone, the Executive Director of Aegis.  It will be three full days from 9 a.m. until 5 p.m. each day devoted to the complete CBO System.  This workshop goes beyond what you may have learned at the Basic CBO Workshop given by Homer Richardson and Wil Graham.  You will study how to properly move money through the system, and how you should operate the charitable trust.  We will show you how Offshore entities, such as offshore trusts, and International Business Companies can be used in connection with this system to get incredible tax advantages, as well as even greater privacy and protection from the IRS.  In fact, we will show you how to create a CBO that has NO tax reporting requirements in the U.S.

To provide ongoing support to clients who purchased trust packages, petitioners as directors of HGAMC at a December 29, 1998, board meeting affirmed and ratified the creation of a department within HGAMC to provide management services, to be known as Trust Management Services.  A bank account had been opened in the name of HG Asset Management Co. d.b.a. Trust Management Services on June 29, 1998, at Lebanon Citizens National Bank, over which petitioners had signatory authority.

Subsequently, in February of 2000, the structure of petitioners' entities was again altered with the creation of

---

[6] An apparently similar seminar conducted in 1998 was approved by the Ohio Supreme Court Commission on Continuing Legal Education for 19.5 hours of CLE credit.

Atlantis Management Services LLC.  HGAMC obtained a 59-percent membership interest.  Other members included Barton Richardson and Mr. Richardson, who served as the managing member.  A second limited liability company, Apache LLC, was created at some point not identified in the record.  HGAMC received a membership interest in this entity of approximately 90 percent, and Mr. Richardson again served as the managing member.  Aegis sent a letter to clients in June of 2000 recommending that an LLC structure be implemented to "take your future trust returns 'off the radar screen' for audit."

On January 10, 1997, and January 22, 1998, the board of directors of HGAMC approved charitable donations to be made to HGRCT of $259,888 for the 1996 year and $51,299 for the 1997 year.  During calendar years 1996 and 1997, HGRCT made no charitable distributions.  On January 27, 1998, the HGRCT board approved charitable contributions totaling $12,994 to be made to the American Cancer Society, Berea College, the Wellness Community, Young Life, the Salvation Army, and New Richmond Elementary School.  Acknowledgments from each of these organizations confirm that donations were received in 1998, although the amount in one instance appears to be $500 greater than that initially approved by the board.  A similar pattern of contributions continued in 1999 through 2002.

Throughout the years in issue and continuing to the present, Mr. Richardson made all of the day-to-day investment decisions with respect to, controlled all of the assets being held by, and had complete supervisory control over HGAMC and HGRCT.

Tax Reporting

For each of the years in issue, petitioners filed: (1) A joint Form 1040, U.S. Individual Income Tax Return, for themselves and including a Schedule C, Profit or Loss From Business, for Asset Protection Services; (2) a Form 1041, U.S. Income Tax Return for Estates and Trusts, for HGAMC; and (3) a Form 990-PF, Return of Private Foundation or Section 4947(a)(1) Nonexempt Charitable Trust Treated as a Private Foundation, for HGRCT. Wilson M. Graham (Mr. Graham) of Graham & Associates signed each of the foregoing returns, except the 1996 Form 1040, as preparer. Mitchell Graham, also of Graham & Associates and Mr. Graham's son, signed the 1996 Form 1040.[7] As indicated by the workshop announcements quoted above, Mr. Graham was involved in promotion of the Aegis trust system. The 1996 Form 1040 was filed on April 15, 1997, and the 1997 Form 1040 was filed on September 23, 1998.

---

[7] Mr. Graham was formerly licensed as a certified public accountant in the State of Ohio, but his license was revoked in 1994. No evidence reflects that Mitchell Graham was at any time licensed as a C.P.A., and testimony indicated that he was not.

On their 1996 Form 1040, petitioners reported adjusted gross income of $11,069, which amount incorporated a $1,920 loss from Schedule C, a $3,000 capital loss, and $4,552 of other income. An attached statement showed that the other income comprised two "DIRECTORS FEES" of $1,500 each and two "PERSONAL USE OF AUTO" amounts of $881 and $671. The Schedule C loss for Asset Protection Services was computed by subtracting $135,088 in expenses from gross income of $133,168. Taxable income is shown as zero and total tax as $212 (on account of self-employment tax).

The 1997 Form 1040 similarly reflected adjusted gross income of $9,694, including $1,006 in business income from Schedule C, a $3,000 capital loss, and other income of $8,190. The other income included two "DIRECTORS FEES" of $3,000 each and two "PERSONAL USE OF AUTO" amounts of $1,095 each. The Schedule C income of $1,006 was derived from $8,127 in gross income and $7,121 of expenses. Petitioners' taxable income was shown as zero and total tax as $990.

On the Forms 1041 filed on behalf of HGAMC for 1996 and 1997, respectively, petitioners reported interest income ($74 and $2,497) and business income from an attached Schedule C ($262,806 and $54,902) and deducted therefrom principally fiduciary fees ($3,000 and $6,000) and charitable deductions to HGRCT ($259,880

and $51,299), to arrive at taxable income of zero.  The Schedule C business income amounts were computed as follows:

|  | 1996 | 1997 |
|---|---|---|
| Gross income | $516,309 | $455,750 |
| Expenses | | |
| Advertising | 0 | 356 |
| Car and truck | 9,970 | 11,472 |
| Commissions and fees | 224,250 | 326,940 |
| Depreciation | 3,504 | 4,507 |
| Insurance | 1,665 | 2,273 |
| Mortgage | 1,738 | 4,860 |
| Office | 213 | 11,142 |
| Repairs and maintenance | 1,832 | 8,768 |
| Taxes and licenses | 2,519 | 2,420 |
| Travel | 4,086 | 14,326 |
| Meals and entertainment | 256 | 1,937 |
| Utilities | 1,214 | 3,724 |
| Other | 2,256 | 8,123 |
| Total expenses | 253,503 | 400,848 |
| Net profit | 262,806 | 54,902 |

The other expenses for 1996 comprised solely meeting expenses, while the other expenses listed for 1997 included bank service charges of $486, directors' meetings of $1,058, education of $2,164, and medical expenses of $4,415.

The amounts reported as gross receipts represented payments made by customers for Aegis trust packages sold by Mr. Richardson and deposited into accounts over which petitioners had signatory authority.  The car and truck expenses related to the 1996 Mercury.  The expenses claimed for depreciation, insurance, mortgage, repairs and maintenance, taxes and licenses, and

utilities were all attributable in significant part to the Quailwoods Drive residence. The insurance expense also included a component for life insurance for Mr. Richardson, and the medical expenses pertained to healthcare for petitioners.

Mr. Richardson signed each of the Forms 1041 as a fiduciary of HGAMC. An attachment to the 1996 return contained the following: "The Fiduciary of this Trust hereby elects to treat contributions made this year and the next subsequent tax year as paid during this tax year as provided for by IRC Secion [sic] 642 (c)(1)". A substantially identical statement was attached to the 1997 return. The attachments further provided that the contributions for the next year to be treated as paid during 1996 and 1997 were $259,880 and $51,299, respectively.

Concerning HGRCT, the Form 990-PF for 1996 reflected no revenue (including contributions), expenditures, assets, or liabilities of any kind. The return listed both petitioners as trustees and indicated that each devoted 2 hours per week to his or her position. Mr. Richardson executed the return as a trustee.

The Form 990-PF for 1997 showed contributions received of $259,880, interest income of $85, operating and administrative expenses of $198, and contributions made of $12,994. Resultant excess of revenue over expenses and disbursements, as well as net assets, was $246,773. Petitioners were again listed as the

trustees with an average of 2 hours apiece per week devoted to their work for HGRCT, and Mr. Richardson again signed the return as trustee.

Examination

On July 13, 1999, the IRS mailed to each petitioner, with respect to the 1996 and 1997 taxable years, a letter advising as follows:

> The Internal Revenue Service has information indicating that you may be involved in a trust arrangement used for tax avoidance purposes. This letter is to inform you of the Internal Revenue Service's position regarding abusive trust arrangements. It is the government's position that trusts will be disregarded for tax purposes and the income will be taxed to the person who controls the trust, if the trust lacks economic substance or has been structured for tax avoidance purposes.
>
> In addition to disregarding the trust entity, the government may pursue civil and/or criminal penalties against taxpayers and promoters who attempt to use trusts to avoid income tax liability.
>
> If you are a participant in a trust scheme that has any of the abusive elements described in Notice 97-24 attached, you have the option of correcting your income tax filings to reflect the proper income and expenses on your personal, corporate and partnership returns, as applicable. Any trust returns previously filed should also be corrected to eliminate income and expenses reported.

The letters went on to request that petitioners provide documentation with respect to the trust (presumably HGAMC) in the event that they determined that their position was appropriate under Notice 97-24, 1997-1 C.B. 409.

Petitioners responded with a letter dated July 21, 1999, communicating that they had been assured by their legal counsel and tax accountant that their trust was "NOT an 'abusive trust' as described in your material." They indicated that they would not be filing an amended return and then proceeded with several pages questioning the authority of the IRS to request documentation with respect to the trust. On August 10, 1999, the IRS sent letters to petitioners notifying that their Forms 1040 and HGAMC's Forms 1041 for 1996 and 1997 had been selected for examination. Petitioners were asked to meet with the examining agent on September 7, 1999, and to provide books, records, and documents related to the returns. Neither petitioner responded to the letters or attended the requested meeting.

David Morgason (Mr. Morgason) was the principal IRS employee responsible for conducting the examination of petitioners' returns. When petitioners failed to provide any information, Mr. Morgason sought to obtain records from third parties through issuance of administrative summonses. One or more such summons was sent to Lebanon Citizens National Bank, and Mr. Richardson responded upon learning of the matter with two letters dated September 22, 1999, one to the IRS and one to the bank. The letter to the IRS asserted that the agent had violated various laws and policies and threatened legal action. The letter to the bank directed the bank not to disclose any of the information requested by summons until presented with a court order to do so.

Mr. Morgason later issued additional summonses to Lebanon Citizens National Bank, and petitioners on February 11, 2000, responded by filing a petition to quash with the U.S. District Court for the Southern District of Ohio.  The Government filed a motion to dismiss the petition to quash, and the District Court granted the motion on July 20, 2000.  Meanwhile, after reviewing the information received to date, Mr. Morgason in the spring of 2000 referred petitioners' case to the IRS Criminal Investigation Division.  Work on the civil case, other than an unsuccessful attempt to solicit from petitioners an extension of the statute of limitations, ceased.

At some point between late 1999 and early 2001, Mr. Richardson was contacted by Missy Vaselaney, an Ohio attorney specializing in tax and estate matters.[8]  Ms. Vaselaney had become aware of the Aegis trust plan through communications with State Farm Insurance agents.  (Ms. Vaselaney's husband was apparently an attorney who did work with State Farm.) Ms. Vaselaney expressed to Mr. Richardson some concerns about the legality of the Aegis system and suggested that he cooperate with her in working with the IRS.  Mr. Richardson declined.  In the words of one State Farm agent and former client of Mr. Richardson, Todd Young (Mr. Young), Ms. Vaselaney assisted a

---

[8] Mr. Richardson first testified that this contact occurred in late 1999 but later testified that the conversation took place between the middle part of February and the middle part of March in 2001.

group of State Farm agents, including Mr. Young, to "get out" of the Aegis system and to resolve their tax audit matters.

While the criminal investigation was ongoing, the IRS also commenced an investigation of Mr. Richardson under section 6700, which imposes a civil penalty for the promotion of abusive tax shelters. Petitioners were formally notified of the investigation, likewise conducted by Mr. Morgason, in or about September of 2002. Mr. Richardson attended an initial conference in connection with the section 6700 investigation on November 8, 2002, and both spouses attended a closing conference on December 17, 2002. Mr. Richardson raised various frivolous arguments at those conferences, including challenges to the authority of the IRS, and while he provided documents, he declined to provide any of the documentation requested by Mr. Morgason.

Following the December meeting, the IRS referred the section 6700 case to the Department of Justice. On February 5, 2003, the United States filed a complaint in the U.S. District Court for the Southern District of Ohio against Mr. Graham, individually and doing business as Graham & Associates, and against Mr. Richardson, individually and doing business as HGAMC. United States v. Graham, No. 1:03cv96 (S.D. Ohio filed Feb. 5, 2003).[9] The Government sought injunctive relief against the defendants with respect to promotion of alleged abusive trust schemes. Id.

---

[9] See infra discussion regarding judicial notice.

On June 23, 2005, the District Court entered an opinion and order to, inter alia, "preliminarily enjoin Defendants from promoting the sales of abusive trusts under the name of Aegis, Heritage, or any other name, or from engaging in any other activities which are subject to penalty under 26 U.S.C. §§ 6700 and 6701", based principally on findings and recommendations made by a magistrate judge in November of 2003 and February of 2004.  Id.

The civil examination of petitioners' returns resumed in approximately April of 2003.  The Government made a jeopardy assessment with respect to petitioners' 1996 and 1997 taxes on May 14, 2003, after an adviser with whom they had invested $450,000 attempted to transfer the funds to a Swiss bank account. The notices of deficiency underlying the cases at bar were then issued on July 10, 2003, to Mr. Richardson and on July 10 or 11, 2003, to Mrs. Richardson.[10]

---

[10] Copies of the notice contained in the record bear different dates.

OPINION

I.  Evidentiary Matter

After briefs were filed in these cases, petitioners filed a motion requesting judicial notice pursuant to rule 201 of the Federal Rules of Evidence (hereinafter Fed. R. Evid. 201).  The motion recites:  "In the Ninth Circuit's decision in *United States v. Smith*, 424 F.3d 992, 1010 **(9ᵗʰ Cir. September 13, 2005)**, the IRS conceded that in some situations, the business trust could report income on its Form 1041 but could alternatively, report the income on the individual's Form 1040 as long as it was reported."  Petitioners then quote two phrases from the referenced case and attach a copy of the complete opinion.  The phrases are taken from the following two paragraphs, set forth in full with the quoted language emphasized by boldface type:

> Smith argues that the particular 1040 personal returns or 1065 partnership tax returns were not false for omitting income or revenue that should have been reported on a separate 1041 trust return.  However, **IRS Agent Brown testified that although revenue in a business trust such as a UBO would typically be reported on a form 1041, as a default the income could also be reported on a 1040 personal income tax return.**  In any event, the income had to be reported on some IRS form.  Thus, the under-reporting of income on the clients' personal returns, that could have been but was not reported elsewhere, made the personal returns "false" or "fraudulent."

> *    *    *    *    *    *    *

Smith argues that the evidence was insufficient to show that he acted willfully "with specific intent to defraud the government in the enforcement of its tax laws." <u>Salerno</u>, 902 F.2d at 1432.  While there is nothing "inherently unlawful with an UBO," and **the government told the jury during closing argument to assume UBOs are "legitimate,"** the government provided ample evidence that Smith gave advice to <u>unlawfully</u> use UBOs to file false or fraudulent tax returns (or not to file at all).  [<u>United States v. Smith</u>, 424 F.3d 992, 1010 (9th Cir. 2005); boldface added.]

Fed. R. Evid. 201 provides in relevant part:

Rule 201.  Judicial Notice of Adjudicative Facts

(a) Scope of rule.  This rule governs only judicial notice of adjudicative facts.

(b) Kinds of facts.  A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Although the rule does not expressly define "adjudicative facts", the Advisory Committee Notes accompanying the rule explains that they are:

those which relate to the parties, or more fully:  When a court or an agency finds facts concerning the immediate parties--who did what, where, when, how, and with what motive or intent--the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts.  [Advisory Committee's Note, 56 F.R.D. 183, 204; internal quotations omitted.]

See also <u>United States v. Amado-Nunez</u>, 357 F.3d 119, 121 (1st Cir. 2004) (defining adjudicative facts as "facts about the parties or events involved in the case").

With respect to then ascertaining whether particular adjudicative facts are capable of accurate and ready determination, this Court has previously noted that "under rule 201, records of a particular court in one proceeding commonly are the subject of judicial notice by the same and other courts in other proceedings", and "Also generally subject to judicial notice under rule 201 is the fact that a decision or judgment was entered in a case, that an opinion was filed, as well as the language of a particular opinion." Estate of Reis v. Commissioner, 87 T.C. 1016, 1027 (1986). In a similar vein, we have observed: "Records of court proceeding are commonly the subject of judicial notice. * * * Although we may take notice of matters that cannot reasonably be questioned, the truth of assertions or findings (as distinguished from the fact that the assertions or findings were made) is ordinarily not properly the subject of judicial notice." Steiner v. Commissioner, T.C. Memo. 1995-122 n.10.

Given these standards, the situation at hand appears to present a somewhat atypical scenario. While taking judicial notice of the opinion by the Court of the Appeals for the Ninth Circuit and the fact that certain statements were made by Government agents in the course of the underlying proceeding would generally comply with the dictates of Fed. R. Evid. 201(b)(2), it is debatable whether the foregoing are in reality

adjudicative facts for purposes of the instant litigation. Petitioners seem to be attempting to employ a motion for judicial notice in a manner more akin to a supplemental brief. Their motion essentially calls to the Court's attention an unrelated case that they feel is pertinent and supportive of their position.

However, even leaving aside for the moment procedural complications and considering the case as we would any other cited precedent, the Court notes that the quoted statements from United States v. Smith, supra at 1010, do not assist petitioners here. Considered in context, the alleged concessions simply stand for the unremarkable proposition that there can exist legitimate unincorporated business entities, the income of which may be properly reported on Forms 1041. The question before us is whether HGAMC and HGRCT were such legitimate entities or whether they were part of a sham arrangement designed to avoid taxes and should be disregarded for tax purposes. This is an inquiry that we resolve infra based on all the facts and circumstances of petitioners' particular situation. The fact that in an unrelated case decided nearly a decade after the transactions here at issue Government agents made certain relatively generic legal statements would not affect our analysis. Petitioners' motion will be denied as moot.

II.   Income Tax Deficiencies - Unreported Income

The Internal Revenue Code imposes a Federal tax on the taxable income of every individual.  Sec. 1.  Section 61(a) defines gross income for purposes of calculating taxable income as "all income from whatever source derived".  Respondent has determined that petitioners were required to include in their gross income, and failed to report on their Forms 1040, the receipts they instead attributed to HGAMC.

A.   Burden of Proof

As a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving error therein.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Although section 7491(a) may shift the burden to the Commissioner with respect to factual issues where the taxpayer introduces credible evidence, the provision operates only where the taxpayer establishes that he or she has complied with all substantiation requirements, has maintained all required records, and has cooperated with reasonable requests for witnesses, information, documents, meetings, and interviews.  Here, as indicated above, petitioners were not forthcoming during the examination of their returns.  Section 7491(a) therefore effects no shift of burden in the instant cases.

However, an additional limitation on the general rule potentially bears upon the cases at bar.  Various Courts of

Appeals, including that for the Sixth Circuit to which appeal in the instant cases would normally lie, have indicated that before the Commissioner may rely on the presumption of correctness in unreported income scenarios, the determination must be supported by at least a "minimal" factual predicate or foundation of substantive evidence linking the taxpayer to income-generating activity or to the receipt of funds. United States v. Walton, 909 F.2d 915, 918-919 (6th Cir. 1990); see also, e.g., Palmer v. United States, 116 F.3d 1309, 1313 (9th Cir. 1997); Portillo v. Commissioner, 932 F.2d 1128, 1133 (5th Cir. 1991), affg. in part, revg. in part, and remanding T.C. Memo. 1990-68; Anastasato v. Commissioner, 794 F.2d 884, 886-887 (3d Cir. 1986), vacating and remanding T.C. Memo. 1985-101; Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), revg. 67 T.C. 672 (1977).

To the extent that those decisions might be on point here, and as will be shown in greater detail below, respondent has introduced sufficient evidence connecting petitioners to the income-producing activities attributed to HGAMC and to the receipt of financial benefits therefrom. For instance, Mr. Richardson's services were paramount in generating the underlying sales, and both petitioners received distributions, directly or indirectly, out of the funds received.

The Court is satisfied that the totality of the record is sufficient to meet any pertinent burden of production placed on

respondent with respect to the adjustments related to the income tax deficiencies and concomitant unreported income at issue here. The burden of showing error in these determinations by respondent remains with petitioners.[11]

B.  Economic Substance of the Trusts

Respondent's principal basis for concluding that petitioners are liable for deficiencies was that HGAMC and HGRCT were sham entities with no economic substance and, consequently, should be disregarded for Federal tax purposes.  As a result, all income earned and allowable expenses incurred under the names of HGAMC and HGRCT would be reported on petitioners' personal income tax returns.  Petitioners dispute these sham characterizations.  They argue that HGAMC was a legitimate business trust under the laws of Ohio created to operate the new business of selling and servicing Aegis trusts.  It is likewise their position that HGRCT was a proper nonexempt charitable trust treated as a private foundation under section 4947(a)(1).

The overarching principles that guide analysis of trust legitimacy are of long provenance.  As summarized by this Court in oft-cited language:

> It is well established that a taxpayer has the legal right to minimize his taxes or avoid them totally

---

[11] The parties' respective burdens as to issues concerning penalties, the statute of limitations, and spousal relief, will be discussed infra in connection with the Court's analysis of those matters.

by any means which the law permits.  Gregory v. Helvering, 293 U.S. 465, 469 (1935).  However, this right does not bestow upon the taxpayer the right to structure a paper entity to avoid tax when that entity does not stand on the solid foundation of economic reality.  When the form of the transaction has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction. Markosian v. Commissioner, 73 T.C. 1235 (1980), citing Furman v. Commissioner, 45 T.C. 360 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967).  This rule applies regardless of whether the entity has a separate existence recognized under State law (Furman v. Commissioner, supra at 365), and whether, in form, it is a trust, a common law business trust, or some other form of jural entity. * * * [Zmuda v. Commissioner, 79 T.C. 714, 719-720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); fn. ref. omitted.]

In ascertaining whether a trust has no economic substance apart from tax considerations, the Court has identified four pertinent factors:  (1) Whether the taxpayer's relationship, as grantor, to the property ostensibly transferred to the trust differed materially before and after the trust's formation; (2) whether the trust had a bona fide independent trustee; (3) whether an economic interest in the trust passed to other beneficiaries; and (4) whether the taxpayer felt bound by any restrictions imposed by the trust itself or the law of trusts. Markosian v. Commissioner, 73 T.C. 1235, 1243-1244 (1980); Gouveia v. Commissioner, T.C. Memo. 2004-256; Norton v. Commissioner, T.C. Memo. 2002-137; Castro v. Commissioner, T.C. Memo. 2001-115; Muhich v. Commissioner, T.C. Memo. 1999-192 (addressing the Heritage/Aegis multitrust system), affd. 238 F.3d

860 (7th Cir. 2001); <u>Buckmaster v. Commissioner</u>, T.C. Memo. 1997-236; <u>Hanson v. Commissioner</u>, T.C. Memo. 1981-675, affd. 696 F.2d 1232 (9th Cir. 1983).

As to the first factor, addressing change in relationship to trust property, the Court as a threshold matter looks to the economic realities of the arrangement to ascertain the true grantor, settlor, or creator, notwithstanding mere nominal designations as such in the trust documents.  <u>Zmuda v. Commissioner</u>, <u>supra</u> at 720-721; <u>Gouveia v. Commissioner</u>, <u>supra</u>; <u>Buckmaster v. Commissioner</u>, <u>supra</u>.  Here, the trust instrument for HGAMC names Mr. Quay as the creator and a director; however, he functioned as nothing more than a temporary "straw man" under the precedent just cited.

Mr. Richardson testified that he had just met Mr. Quay at an Aegis training convention in May or June of 1996, a few months before the HGAMC documents were executed, and had no contact with him after 1997.  Mr. Richardson further testified that having an attorney named as creator and a director of the entity was a condition imposed by Aegis on the purchase of the trust package. Any drafting work would also likely have been minimal, given that, as a mass-marketed trust "package", the Aegis system involved distribution to multiple purchasers of similar, standardized documents.  Mr. Quay contributed no assets to HGAMC, never had signatory authority over any of HGAMC's accounts,

received no compensation for his duties as director, and resigned after only 6 days.  Hence, it is clear that Mr. Quay's role, and a transient one at that, existed on paper only.  All stake in establishing HGAMC patently came from petitioners alone.  Economic realities thus point to petitioners as the true grantors of HGAMC.

In this connection, we further note that in situations where one spouse first transfers his or her property to the other spouse, who in turn transfers the received property along with his or her own to the entity, courts typically ignore the first conveyance when considering questions of grantor.  E.g., Neely v. United States, 775 F.2d 1092, 1095 (9th Cir. 1985); Schulz v. Commissioner, 686 F.2d 490, 496 (7th Cir. 1982), affg. T.C. Memo. 1980-568; Kooyers v. Commissioner, T.C. Memo. 2004-281.  Either of two rationales counsels this approach.  The conveyance is ignored (1) because substance predominates over form in tax matters and/or (2) because the parties themselves did not treat the conveyance as either a sale or a gift.  Neely v. United States, supra at 1095; Schulz v. Commissioner, supra at 496; Kooyers v. Commissioner, supra.  Here, the record in any event shows a scenario akin to a so-called step transaction where Mrs. Richardson's transfer was only the first in a series of preplanned steps, such that intermediary maneuvers should be ignored in favor of substance.

On a related point, we likewise are satisfied that petitioners should be considered the true grantors of HGRCT. Although according to the documentation HGAMC purportedly created HGRCT, this Court in considering the first of the four factors in the context of multitiered trust arrangements has made no such distinction. See Castro v. Commissioner, supra; Muhich v. Commissioner, supra; see also Kooyers v. Commissioner, supra ("Because petitioners are grantors of the * * * [first-tier] Trust, they are also grantors of the * * * [second-tier] Trust and any other trust for which * * * [those] trusts are grantors."); Dahlstrom v. Commissioner, T.C. Memo. 1991-264 ("Petitioners were instrumental in the creation of all the trusts involved in their multitiered arrangement."), affd. without published opinion 999 F.2d 1579 (5th Cir. 1993).

Having determined that petitioners should be viewed as the grantors of HGAMC and HGRCT, we turn to whether their relationship to property ostensibly transferred to these entities differed materially before and after the trusts' formation. Here, the record reflects that the relationship of petitioners to both their physical assets and their income-producing activities remained essentially unchanged. Notably, petitioners continued to live in and operate their residence with no restriction on their personal use of that property or any other of their tangible assets. The only apparent difference stemming from the

transfer is that petitioners thereafter sought to deduct substantial personal living expenses incurred in connection with the property, such as insurance, repairs, maintenance, and utilities. They even commenced a remodeling project at the Quailwoods location, and nothing in the record indicates that the resulting improvements did not enhance petitioners' personal use of the property for residential purposes. Attempts to legitimize deductions of this nature through designation of the property as HGAMC's "headquarters" are unavailing. A passing reference by petitioners on brief to a home office likewise does nothing to aid their cause. Deductions related to business use of a residence are strictly circumscribed by the rules of section 280A and would require petitioners to show, at minimum and as relevant here, that some portion of the home was "exclusively used on a regular basis" for business. Sec. 280A(c)(1). The evidence before the Court does not even so much as suggest that to be the case.

As regards income-producing activities, again no truly material change appears to have been worked by implementation of the trust system. Petitioners' primary contention in arguing for a changed relationship centers on this aspect and is summarized on brief as follows:

> The allegation that the taxpayers' relationship as grantor to the property did not differ materially before and after the creation of the trusts is ludicrous. There was no substantial trust property (aside from the Richardsons' home) before the creation

of the trust.  The trusts were created to operate a brand-new business.  This new business of selling and servicing Aegis Trusts is the primary property of the trusts.  Additionally, the creation and use of a business management trust for such a purpose is a codified creation of the law of the State of Ohio.

At the outset, we stress again that the legitimacy of an entity under State law as a business trust or any other recognized form has no bearing on an economic substance analysis and will not be discussed further.  See Zmuda v. Commissioner, 79 T.C. at 720, and cases following.  More importantly, petitioners' remonstrance concerning a new business is on these facts a distinction without a difference, not to mention factually suspect.

The HGAMC trust instrument and the annual contracts between HGAMC and Asset Protection Services reflect an arrangement where the sole proprietorship, not HGAMC, conducted the underlying business of selling Aegis trusts.  HGAMC in turn was purportedly engaged to manage Asset Protection Services through the provision of Mr. Richardson's services to his own sole proprietorship.  This structure is corroborated by the descriptions identifying the nature of HGAMC's business on certain of its Forms 1041 as "MANAGEMENT SERVICES".

Mr. Richardson earned his livelihood as a self-employed salesman of insurance policies from 1993 through 1996.  Thus, at the time the instruments establishing HGAMC were executed, Mr. Richardson had been employed for several years in selling

financial management products aimed at protecting assets and/or addressing contingencies that might arise in the face of death or other hardship.  As he began to focus more of his efforts on promoting Aegis trusts, he continued to be engaged, through a sole proprietorship, in selling financial management products aimed at protecting assets and/or addressing contingencies that might arise in the face of death or other hardship.  Aegis trust packages were advertised as tools to:  Legally reduce Federal and State income taxes "70% or More"; eliminate Federal estate taxes no matter the size of the estate; sell a business or other assets and pay no capital gain taxes; and protect personal assets from lawsuit judgments.  Mr. Richardson testified:

> A    * * * Asset Protection Services was to provide asset protection.  That's basically what it says, and that would be insurance basically and provide trying to sell trusts as well.  Yes.
>
> Q    Okay.  So your sole proprietorship was to sell both insurance and Aegis trusts.
>
> A    That's correct.
>
> Q    You had been selling insurance for several years before 1996.  Is that correct?
>
> A    Right.
>
> Q    Back to at least 1992?
>
> A    1992 or '93.
>
> Q    Before 1996 you called your sole proprietorship Benefit Planning Services.
>
> A    That's correct.

Mr. Richardson also testified that he first received a referral fee from Aegis in March of 1996 for bringing an individual to meet with, and introducing him to, Mr. Bartoli in Chicago.

The record is nebulous at best on the genesis of any activity on the part of HGAMC. The Form SS-4, Application for Employer Identification Number, stated that business started on April 1, 1996. The instrument that by its terms "created and established" HGAMC is dated August 17, 1996. Petitioners' signatures on many of the documents pertaining to HGAMC and dated in August were notarized on December 3, 1996. Mr. Richardson's testimony on this point was confused, if not contradictory, and in the midst of an unsuccessful colloquy attempting to reconcile various dates, he was able only to offer that HGAMC was "operated" before August 17, 1996.

Given these circumstances, it cannot be said that the record bears out petitioners' attempts to portray the establishment of HGAMC as working some sort of clean break in Mr. Richardson's ongoing business activities, in terms of either the nature of those activities or the timeframe for their occurrence. The Court thus is unable to perceive that the entity's existence engendered any material change in petitioners' relationship to the property allegedly transferred thereto. Furthermore, since the only property contributed to HGRCT was 10 units of beneficial interest in HGAMC, creation of this second tier likewise produced no material changes.

The second factor investigates the presence of any bona fide independent trustee over the entity in question. A nominal trustee will not withstand scrutiny under this factor absent a meaningful role in; i.e., an exercise of control over, the operation of the trust. Gouveia v. Commissioner, T.C. Memo. 2004-256; Norton v. Commissioner, T.C. Memo. 2002-137; Castro v. Commissioner, T.C. Memo. 2001-115.

With respect to HGAMC, which employed the term "director" as opposed to "trustee", Mr. Quay was initially named as such. Nonetheless, his brief, 6-day stint is devoid of meaning for reasons akin to those discussed above in connection with his role as creator. In particular, his lack of even nominal signatory authority over any of the financial accounts opened in the entity's name belies any true oversight or control. As regards HGRCT, petitioners were from inception designated as the trustees, and no third party was named to the position. The facts thus reveal that petitioners were the sole individuals with operational control over HGAMC and HGRCT, and that their discretion was unfettered by any independent trustee.

The third factor looks at whether a genuine economic interest in the trust passed to any beneficiaries other than petitioners. The 100 units of beneficial interest in HGAMC were divided between Mr. Richardson, Mrs. Richardson, and HGRCT. The 100 units of beneficial interest in HGRCT were in turn held by

HGAMC.  Hence, the pertinent documents did not even purport to give any third party an economic interest in these entities.

The fourth and final factor considered is whether petitioners felt bound by any restrictions imposed by the trusts or the law of trusts.  In the case of HGAMC, the authority granted to petitioners as directors was so broad as to impose no meaningful restrictions.  Any fiduciary duties under relevant law would also be illusory for all practical purposes in that the circular arrangement of entities utilized left petitioners as the only true beneficiaries.

Concerning HGRCT, the trust instrument on its face prohibits transactions that would "in the opinion of the trustees, jeopardize the federal income tax exemption of this trust pursuant to section 501(c)(3) of the Internal Revenue Code".  However, petitioners never even obtained section 501(c)(3) status for HGRCT.  This failure to implement what would seem to be a basic, foundational premise for the trust's operation leads us to conclude that HGRCT's existence and purported charitable character (as well as contribution activities in years subsequent to those in issue) were hardly more than a facade or window dressing that did little to bind petitioners' use of their assets.[12]

---

[12] Mr. Young explained the understanding of the Aegis trust structure that he formed through attendance at a seminar or seminars conducted by Mr. Graham and Mr. Richardson and review of
(continued...)

Although petitioners make multiple references on brief to HGRCT as an "IRC §4947(a) non-exempt charitable trust", these appellations smack of a dubious and belated attempt to reframe the scenario and lend legitimacy to HGRCT. More importantly, the characterizations do nothing to alter the fact that petitioners were not bound by the paper structure they created but chose to function under an alternative arrangement. In any event, when considering a factual scenario and claims virtually indistinguishable from those at hand, this Court saw no reason to afford credence to the purported charitable trust. <u>Muhich v. Commissioner</u>, T.C. Memo. 1999-192. The persuasive power of the record here is no greater.

To summarize, the factors typically considered by this Court in assessing the economic reality of a trust structure counsel that HGAMC and HGRCT do not warrant recognition for tax purposes.

---

[12](...continued)
Aegis materials as follows:

> The way you would save money on your taxes is you'd set up an asset management company, and then you'd set up a charitable trust, so you would put your money into an asset management company, and then you'd pay your expenses out of that for your house and for your living expenses.

> *    *    *    *    *    *    *

> But anyway, the charitable trust was something that you put your excess money into it was told to me, and you had to pay out the five percent each year to a charity, but then it was explained to me that you essentially would become your own charity, and that was to be our retirement plan.

The Court therefore concludes that the income and allowable expenses attributable to HGAMC and HGRCT are taxable to petitioners.

Specifically, because HGAMC and HGRCT were shams, petitioners are required to include in their income for 1996 and 1997 business gross income and interest income reported by HGAMC and interest income reported by HGRCT. In this connection, petitioners at certain junctures have contended that the amounts of business income reported on the various returns germane to this calculation were overstated on account in some instances of double reporting and in other instances of reporting gross receipts from the sales of Aegis trusts as opposed to merely the proper commission income on those sales.

The record, however, contains no documentary evidence whatsoever that would support or corroborate an alternative computation. Furthermore, we observe that petitioners, and not Aegis, had unfettered control and signatory authority over relevant accounts into which the sales proceeds were deposited. In these circumstances, we cannot relieve petitioners of the implied concessions worked by their and their entities' filed returns. See Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. T.C. Memo. 1968-126; Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989).

As regards expenses, respondent determined that petitioners were entitled to deduct on their returns a portion of the

business expenses claimed by HGAMC for each year and disallowed the remainder.  Respondent also disallowed a portion of the expense for commissions and fees claimed by petitioners in 1996 on the Schedule C for Asset Protection Services.

Deductions are a matter of "legislative grace", and "a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms."  New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); see also Rule 142(a).  As a general rule, section 162(a) authorizes a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  An expense is ordinary for purposes of this section if it is normal or customary within a particular trade, business, or industry.  Deputy v. du Pont, 308 U.S. 488, 495 (1940).  An expense is necessary if it is appropriate and helpful for the development of the business.  Commissioner v. Heininger, 320 U.S. 467, 471 (1943).  Section 262, in contrast, precludes deduction of "personal, living, or family expenses."

The breadth of section 162(a) is tempered by the requirement that any amount claimed as a business expense must be substantiated, and taxpayers are required to maintain records sufficient therefor.  Sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. 540 F.2d 821 (5th Cir. 1976); sec. 1.6001-1(a), Income Tax Regs.  When a taxpayer adequately establishes that he or she paid or incurred a deductible expense

but does not establish the precise amount, we may in some circumstances estimate the allowable deduction, bearing heavily against the taxpayer whose inexactitude is of his or her own making.  Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).  There must, however, be sufficient evidence in the record to provide a basis upon which an estimate may be made and to permit us to conclude that a deductible expense, rather than a nondeductible personal expense, was incurred in at least the amount allowed.  Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

Furthermore, business expenses described in section 274 are subject to rules of substantiation that supersede the doctrine of Cohan v. Commissioner, supra.  Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), affd. 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).  Section 274(d) provides that no deduction shall be allowed for, among other things, traveling expenses, entertainment expenses, gifts, and expenses with respect to listed property (as defined in section 280F(d)(4) and including passenger automobiles, computer equipment, and cellular telephones) "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement":  (1) The amount of the expenditure or use; (2) the time and place of the expenditure or use, or date and

description of the gift; (3) the business purpose of the expenditure or use; and (4) in the case of entertainment or gifts, the business relationship to the taxpayer of the recipients or persons entertained. Sec. 274(d).

On this issue, petitioners neither at trial nor on brief offered evidence or argument directed towards the deductibility of any of the specific expenses disallowed by respondent. Respondent's determinations therefore are sustained as to those adjustments.[13]

In addition, respondent determined that petitioners were liable for self-employment taxes, and entitled to corresponding self-employment tax deductions, on business income attributed to them from HGAMC in 1996 and 1997. Section 1401 imposes an additional tax on the self-employment income of every individual, both for old age, survivors, and disability insurance and for hospital insurance. The term "self-employment income" denotes "net earnings from self-employment". Sec. 1402(b). "Net earnings from self-employment", in turn, means "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business". Sec. 1402(a).

---

[13] The Court further notes that although petitioners would generally be entitled to deduct substantiated charitable contributions on their personal returns in accordance with our disregard of the trusts, all donations by HGRCT were made in calendar year 1998 or thereafter. Petitioners are calendar year taxpayers, and the years before the Court are 1996 and 1997.

Again, petitioners have offered no evidence or argument pertaining to the self-employment tax. The Court has concluded that HGAMC should be disregarded, and the record supports that Mr. Richardson's personal services were the prime driver of the receipts attributed to the entity. Hence, to the extent that we have sustained respondent's determinations with respect to business income, we likewise sustain the imposition of corresponding self-employment tax thereon.

## III. Capital Gain and/or Loss

On their Forms 1040 for each of the years 1996 and 1997, petitioners claimed a $3,000 capital loss and indicated that these losses were carried forward from prior years. Respondent disallowed the amounts claimed, and petitioners have never explained or substantiated their genesis. Respondent further determined that in 1997 petitioners sold stock in a company called Next Level Systems that was held in the name of HGAMC. Proceeds in the amount of $8,614 were apparently received on the sale and were not reported on petitioners' return or that of HGAMC. As petitioners had not established any basis in the shares, respondent determined that the full amount constituted capital gain.

As a general rule, a taxpayer is required on the disposition of property to report as capital gain the excess of the amount realized on disposition over his or her adjusted basis in the property. Sec. 1001. Alternatively, a taxpayer (other than a

corporation) may claim losses on the sale or exchange of capital assets to the extent of the lesser of $3,000 ($1,500 if married filing separately) or the excess of such capital losses over capital gains.  Sec. 1211(b).

Once more, in what is becoming a familiar refrain, the record is devoid of evidence on this matter.  The Court therefore sustains respondent's determinations.

## IV.  Section 6663 Fraud Penalties

Section 6663(a) provides for the imposition of a penalty in "an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud."  In addition, section 6663(b) specifies that, if any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable thereto, except and to the extent that the taxpayer establishes some part is not due to fraud.

Respondent bears the burden of proving the applicability of the civil fraud penalty by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  To sustain this burden, respondent must establish by this level of proof both (1) that there was an underpayment of tax for each taxable year in issue and (2) that at least some portion of such underpayment was due to fraud. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).

### A.  Underpayments of Tax

The first prong of the above fraud test mandates that respondent prove the existence of an underpayment of tax for each year. In doing so, respondent may not simply rely on the taxpayer's failure to prove error in the deficiency determination. DiLeo v. Commissioner, supra at 873; Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). Here, the evidence leaves no doubt that substantial taxable income was generated through Mr. Richardson's efforts in selling Aegis trusts. The totality of the record also clearly establishes that the entities that petitioners attempted to interpose between themselves and those receipts were not worthy of credence. Petitioners failed to include that income on their 1996 and 1997 returns and, as a result, underpaid their taxes. Petitioners' quibbles over various details and amounts notwithstanding, respondent has in any event shown by clear and convincing evidence the essential elements of the scenario which led to underpayments of tax.

B. Fraudulent Intent

The second prong of the fraud test requires respondent to show that a portion of the underpayment is attributable to fraud. Fraud for this purpose is defined as intentional wrongdoing on the part of the taxpayer, with the specific purpose of avoiding a tax believed to be owed. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958). Stated differently,

imposition of the civil fraud penalty is appropriate upon a showing that the taxpayer intended to evade taxes believed to be owing by conduct designed to conceal, mislead, or otherwise prevent the collection of taxes. DiLeo v. Commissioner, supra at 874.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Id.; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Recklitis v. Commissioner, 91 T.C. 874, 909-910 (1988); Beaver v. Commissioner, 55 T.C. 85, 92 (1970). However, because direct proof of a taxpayer's intent is seldom available, fraud may be established by circumstantial evidence. Spies v. United States, 317 U.S. 492, 499-500 (1943); DiLeo v. Commissioner, supra at 874. In this connection, courts have developed a nonexclusive list of circumstantial indicia, or "badges", of fraud that may support a finding of fraudulent intent.

Among the badges of fraud that can be distilled from caselaw are the following: (1) Understatement of income; (2) maintenance of inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of income or assets; (6) failure to cooperate with tax authorities; (7) engaging in illegal activities; (8) dealing in cash; (9) failure to make estimated tax payments; and (10)

filing false documents. Spies v. United States, supra at 499-500; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, supra at 910. In examining these factors, this and other courts have further noted that the taxpayer's background, his or her level of education and prior history of filing proper returns, and the context of the events in question are relevant to the inquiry. Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274; Sowards v. Commissioner, T.C. Memo. 2003-180; Temple v. Commissioner, T.C. Memo. 2000-337, affd. 62 Fed. Appx. 605 (6th Cir. 2003).

Applying these considerations here, the Court concludes that Mr. Richardson fraudulently intended to underpay tax for each of the years in issue. Because matters of background and context speak especially loudly in these unique circumstances, several features are worthy of emphasis at the outset. As regards personal background, Mr. Richardson was not unsophisticated. He had passed accounting courses, possessed a business degree in marketing, and had years of experience in business in general and the sale of financial products in particular. Respondent's concession that petitioners filed correct returns prior to 1996 also speaks to an awareness of tax obligations.

With respect to context for the events in question, perhaps the most salient feature that must inform any analysis of the

questions raised by this litigation comes to light.

Mr. Richardson was not a mere participant in or purchaser of a mass-market trust scheme; he was an <u>active promoter</u>. He traveled throughout a multistate area lending his prestige and expertise to and conducting seminars on the Aegis system. He thus was necessarily intimately acquainted with the details of the program and the intended benefits. The advertising materials make clear that tax reduction was emphasized above all other advantages. This was amply corroborated by the credible testimony of Mr. Young, who attended a number of seminars involving Mr. Graham and Mr. Richardson and who purchased first a trust package from Aegis and later additional management services from Mr. Richardson. In his words, "the main thrust was to save money on your taxes as much as 70 percent." Mr. Richardson's demeanor at trial and disingenuous attempts to distance himself from the Aegis organization, on the other hand, were singularly unconvincing.

The preeminence of tax considerations in Mr. Richardson's implementation of the Aegis system is likewise corroborated by materials contained in the minutes of HGAMC board meetings. The quantity of statements addressing tax matters is telling. Even more revealing is the specific content of the June 27, 1997, minutes. This document shows that within a few weeks of filing his 1996 return and long before the 1997 return was filed,

Mr. Richardson was aware of and expressly opposing the challenges raised by respondent to similar trust arrangements.

Against this backdrop, a number of the traditional "badges" of fraud should be considered as well.  As regards understatement of income, consistent failure to report substantial amounts of income over a number of years is highly persuasive evidence of fraudulent intent.  Kurnick v. Commissioner, 232 F.2d 678, 681 (6th Cir. 1956), affg. T.C. Memo. 1955-31; Temple v. Commissioner, supra.  Petitioners reported gross income of less than $15,000 and taxable income of less than $1,000 on their Forms 1040 for each 1996, 1997, and 1998.  They did so during a period when Mr. Richardson generated receipts totaling more than $1.5 million over the 3 years from selling Aegis trusts and related services.  Petitioners avoided reporting those funds by intentionally diverting such amounts to returns of other entities that the Court has held to be devoid of economic substance.  This pattern weighs heavily in favor of a conscious intent to evade tax.

With respect to record maintenance, petitioners at no time throughout the administrative or litigation process produced documentary records to substantiate business income or expenses. Possible inferences are that they either failed to keep such records or elected to conceal them to further obfuscate their activities.  Neither is favorable to petitioners.

Concerning explanations for behavior, petitioners, other than offering a few broad, general statements, have made little attempt to justify or illuminate the rationale underlying their association with the Aegis system.  Certain inconsistencies, however, give us pause.  Mr. Richardson at trial testified that he had consulted with several independent tax professionals before purchasing the Aegis trust package, but in response to a previous interrogatory from respondent requesting identification of persons from whom advice was secured prior to creation of the trusts had listed only individuals connected with Aegis. Mr. Richardson's testimony that he became uncomfortable in late 1999 or 2000 with arguments being asserted by Aegis in conjunction with challenges to the trust structure and began to disengage from those positions is likewise suspect. Mr. Morgason's description of Mr. Richardson's behavior during the 2002 section 6700 investigation is to the contrary and is corroborated by audio recordings of conferences conducted pursuant thereto.

Concealment of income and assets is at the crux of this litigation and requires little further discussion.  The establishment of a trust structure without economic substance, to which income and assets are transferred for tax avoidance purposes, has been considered by this Court to be an affirmative indicium of fraud.  Mason v. Commissioner, T.C. Memo. 2004-247; Dunlap v. Commissioner, T.C. Memo. 1993-187; Brittain v.

Commissioner, T.C. Memo. 1992-277.  As a related point, petitioners' use of the trust arrangement to claim business deductions for personal expenses, especially items related to their personal residence, likewise bolsters the impression of a concerted effort to avoid taxation.

Failure to cooperate with tax authorities is another particularly noteworthy badge on these facts.  Petitioners not only declined to cooperate in the examination of their returns but also sought actively to impede the audit.  Petitioners did not provide any substantive information in response to Mr. Morgason's requests.  They then went so far as to prevent respondent from obtaining data from third parties by, for instance, discouraging compliance with summonses and even filing a petition to quash.

The badge pertaining to illegal activities is germane here as well.  Mr. Richardson was in the business of promoting and selling abusive trust arrangements, which created revenue issues for respondent and for countless purchasers.  Moreover, as pointed out by the District Court in the section 6700 proceeding against Mr. Richardson and Mr. Graham, "whether before or after Muhich I or its affirmance by the Seventh Circuit, the trust scheme in which they engaged was, and ought to have been known to be, illegal."  United States v. Graham, No. 1:03cv96 (S.D. Ohio June 23, 2005).  The very business income concealed in

petitioners' trust structure was generated through sales of an illegal product.

Mr. Richardson's failure to heed warnings with respect to the improper nature of the Aegis trust structure and analogous schemes likewise has bearing on his state of mind and intentions at the time he chose to purchase and use the package. Specifically, the failure suggests that the legality of the arrangement was of little concern to Mr. Richardson. Mr. Richardson was aware of Notice 97-24, 1997-1 C.B. 409, by June of 1997. He was contacted by Ms. Vaselaney between late 1999 and early 2001. The magistrate judge in the section 6700 proceeding initially recommended a preliminary injunction, based on Mr. Richardson's participation in what was characterized as an "illogical and illegal" scheme, in November of 2003. United States v. Graham, No. 1:03cv96, 2003 WL 23169851, at *7 (S.D. Ohio Nov. 19, 2003). In the face of all these warnings, it would seem that an individual truly interested in a legitimate arrangement would have at least sought out an independent evaluation, rather than continuing to align him- or herself with insiders, many of whom had questionable qualifications.

In summary, the majority of the badges of fraud considered by this and other courts are present here. Accordingly, the Court concludes that the circumstantial indicia revealed by the record in these cases establish by clear and convincing evidence that Mr. Richardson intended through his use of the Aegis trust

system to evade taxes known to be owing. Respondent has shown that at least some part of the underpayment for each 1996 and 1997 is attributable to fraud. Furthermore, because Mr. Richardson has failed to show that any portion of the underpayments upon which the section 6663 penalty was computed was not due to fraud, respondent is sustained as to this issue with respect to both years.

## V. Section 6662 Accuracy-Related Penalty

Subsection (a) of section 6662 imposes an accuracy-related penalty in the amount of 20 percent of any underpayment that is attributable to causes specified in subsection (b). Subsection (b)(1) of section 6662 then provides that among the causes justifying imposition of the penalty is negligence or disregard of rules or regulations.

"Negligence" is defined in section 6662(c) as "any failure to make a reasonable attempt to comply with the provisions of this title", and "disregard" as "any careless, reckless, or intentional disregard." Caselaw similarly states that "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Pursuant to regulations, "'Negligence' also includes

any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs.

An exception to the section 6662(a) penalty is set forth in section 6664(c)(1) and reads: "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

Regulations interpreting section 6664(c) state:

> The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. * * * [Sec. 1.6664-4(b)(1), Income Tax Regs.]

Reliance upon the advice of a tax professional may, but does not necessarily, demonstrate reasonable cause and good faith in the context of the section 6662(a) penalty. Id.; see also United States v. Boyle, 469 U.S. 241, 251 (1985); Freytag v. Commissioner, supra at 888. Such reliance is not an absolute defense, but it is a factor to be considered. Freytag v. Commissioner, supra at 888.

In order for this factor to be given dispositive weight, the taxpayer claiming reliance on a professional must show, at minimum: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and

(3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see also, e.g., Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting verbatim and with approval the above three-prong test), affg. 121 T.C. 89 (2003); Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), affg. T.C. Memo. 1993-634; Cramer v. Commissioner, 101 T.C. 225, 251 (1993), affd. 64 F.3d 1406 (9th Cir. 1995); Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978); Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Ellwest Stereo Theatres v. Commissioner, T.C. Memo. 1995-610.

As regards burden of proof, section 7491(c) provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title." The Commissioner satisfies this burden of production by "[coming] forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty" but "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions." Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Rather, "it is the taxpayer's responsibility to raise those issues." Id.

The notice of deficiency issued to Mr. Richardson asserted applicability of the section 6662(a) penalty on account of

negligence or disregard with respect to the portion of the underpayment attributable to disallowance of the $3,000 capital loss claimed by petitioners for 1996. We conclude that respondent has met the section 7491(c) burden of production as to this matter. The evidence adduced in these cases reveals a complete absence of adequate records and substantiation for the reported loss. With this threshold showing, the burden shifts to Mr. Richardson to establish that he acted with reasonable cause and in good faith as to this item.

Petitioners did not mention the capital loss or how it was derived either at trial or on brief, nor have they offered any specific arguments directed to the section 6662 penalty. The Court therefore is unable to offer relief from the determined amount.

## VI. Statute of Limitations

As a general rule, section 6501(a) provides that any tax must be assessed within 3 years of the date on which the pertinent tax return was filed. However, an exception exists in the case of "a false or fraudulent return with the intent to evade tax", under which exception tax may be assessed "at any time." Sec. 6501(c)(1). The Commissioner bears the burden of proving fraud in this context as well, but again, it is sufficient for avoidance of the statue of limitations to establish only that some portion of the deficiency is due to

fraud.  Sec. 7454(a); Rule 142(b); <u>Jackson v. Commissioner</u>, 380 F.2d 661, 664 (6th Cir. 1967), affg. T.C. Memo. 1964-330.

Furthermore, it must be noted that it is the false or fraudulent <u>return</u> that holds the statute open.  <u>Ballard v. Commissioner</u>, 740 F.2d 659, 663 (8th Cir. 1984), affg. in part and revg. in part on another ground T.C. Memo. 1982-466; <u>Allen v. Commissioner</u>, T.C. Memo. 1986-125.  As a result, this and other courts have long held that where a joint return is filed, fraud by one spouse will serve to lift the statute of limitations as to, and permit assessment against, both spouses.  E.g., <u>Ballard v. Commissioner</u>, <u>supra</u> at 663; <u>Carsendino v. Commissioner</u>, T.C. Memo. 1994-79; <u>Dahlstrom v. Commissioner</u>, T.C. Memo. 1991-264; <u>Allen v. Commissioner</u>, <u>supra</u>.

Because respondent here has by clear and convincing evidence proven fraud on the part of Mr. Richardson for the reasons explained above, assessment of petitioners' 1996 and 1997 tax liabilities is not barred by the statute of limitations. Petitioners' intonations at various junctures that Mrs. Richardson is entitled to judgment as a matter of law on statute of limitations grounds are without legal basis or merit.

VII.  <u>Relief From Joint and Several Liability</u>

Notwithstanding the Court's rulings on the foregoing issues, petitioners assert that Mrs. Richardson is in any event entitled to relief from joint and several liability under section 6015(b)(1).  As a general rule, section 6013(d)(3) provides that

"if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several."  An exception to such joint and several liability exists, however, for spouses able to satisfy the statutory requirements for relief set forth in section 6015.

Section 6015 authorizes three types of relief.  Subsection (b) provides a form of relief available to all joint filers and similar to, but less restrictive than, that previously afforded by former section 6013(e).  Subsection (c) permits a taxpayer who has divorced or separated to elect to have his or her tax liability calculated as if separate returns had been filed.  Subsection (f) confers discretion upon respondent to grant equitable relief, based on all facts and circumstances, in cases where relief is unavailable under subsection (b) or (c).  Mrs. Richardson here explicitly makes her appeal under subsection (b)(1), the requisite elements of which are as follows:

> SEC. 6015(b).  Procedures for Relief From Liability Applicable to All Joint Filers.--
>
> > (1) In general.--Under procedures prescribed by the Secretary, if--
> >
> > > (A) a joint return has been made for a taxable year;
> > >
> > > (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;
> > >
> > > (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no

reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

The burden rests on Mrs. Richardson to establish that she has met each of five elements enumerated above. Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004). Respondent has conceded that the first and fifth requirements are satisfied; thus, the second, third, and fourth requirements remain in dispute.

At the outset, we highlight a few difficulties created by the state of the record on this issue. Mrs. Richardson did not testify at trial, so the Court has had no opportunity to assess her demeanor and credibility, nor has respondent had a chance to solicit information on cross-examination. In fact, there is a notable dearth of evidence directed specifically to this issue. What data can be gleaned about Mrs. Richardson's involvement in

the trust scheme must therefore be drawn principally from minutes of board meetings for HGAMC and HGRCT and from a few comments made by Mr. Richardson at trial. Neither of these sources is particularly supportive of petitioners' position.

Turning to the particular requirements of section 6015(b) in dispute here, we note that cases interpreting former section 6013(e) remain instructive in our analysis of the parallel requisites of section 6015(b). Butler v. Commissioner, 114 T.C. 276, 283 (2000). Section 6015(b)(1)(B) mandates that the understatement of tax be attributable to erroneous items of the nonrequesting spouse. A similar attribution provision was contained in former section 6013(e)(1)(B) and has been construed by this and other courts. As regards the pertinent legal standard, the Court of Appeals for the Fifth Circuit has stated: "where omitted income is generated by the performance of substantial services by one spouse, that income should be attributed to that spouse for purposes of section 6013(e)(1)." Allen v. Commissioner, 514 F.2d 908, 913 (5th Cir. 1975), affg. in part, revg. in part on another ground, and remanding 61 T.C. 125 (1973). This Court has since applied the foregoing principle in cases under both 6013(e)(1) and 6015(b)(1). E.g., Ishizaki v. Commissioner, T.C. Memo. 2001-318; Grubich v. Commissioner, T.C. Memo. 1993-194.

The understatements for 1996 and 1997 in these cases flowed in large part from petitioners' failure to include receipts

generated by sales of Aegis trusts and related services.  As suggested by the preceding findings and discussion, the totality of the record, while leaving much to be desired, indicates that it was Mr. Richardson who engaged in the underlying selling operations.  Petitioners would thus seem to have a colorable argument with respect to at least a portion of the understatements being attributable to erroneous items of Mr. Richardson.  Nonetheless, it is unnecessary for the Court to reach a definitive conclusion as to this requirement in light of the conjunctive nature of the criteria and the following.

Section 6015(b)(1)(C) specifies that the requesting spouse have had neither knowledge nor reason to know of the understatement at the time the return was signed.  A requesting spouse is considered to have reason to know in this context if a reasonably prudent taxpayer in his or her position, at the time the return was signed, could be expected to know that the return contained an understatement or that further investigation was warranted.  Butler v. Commissioner, supra at 283.  Hence, the spouse seeking relief may have a "duty of inquiry".  Id. at 284.  In applying the foregoing "reason to know" standard, factors considered relevant include:

> (1) The alleged innocent spouse's level of education;
> (2) the spouse's involvement in the family's business
> and financial affairs; (3) the presence of expenditures
> that appear lavish or unusual when compared to the
> family's past income levels, income standards, and
> spending patterns; and (4) the culpable spouse's

> evasiveness and deceit concerning the couple's
> finances. [Id.; citation omitted]

Here, the degree of involvement suggested by the documentary record, in the absence of any credible countervailing testimony by Mrs. Richardson, is fatal to her claim. Mrs. Richardson was a director of HGAMC and a trustee of HGRCT. She executed each of the documents involved in establishing and operating the entities, including the agreements between HGAMC and Asset Protection Services pertaining to Mr. Richardson's services. She signed the minutes for each of the dozens of board meetings, which recounted in notable detail purported activities of the entities. Perhaps even more importantly, Mr. Richardson testified at trial that Mrs. Richardson attended all of the meetings where those matters were discussed. The Forms 990-PF claim that Mrs. Richardson devoted 2 hours per week to her work as trustee for HGRCT. Mrs. Richardson also possessed signatory authority over entity bank accounts. There is no indication of any evasiveness toward Mrs. Richardson on Mr. Richardson's part; rather, Mrs. Richardson was apparently welcomed as a participant in the HGAMC and HGRCT arrangement.

Despite the above evidence, petitioners contend on brief that Mrs. Richardson "was undergoing treatment for cancer and was unable to work for the entire 1997 tax year. She is 69 years old, works as a medical assistant and has a high school education." They also make reference to her being "unschooled in

tax matters" and relying on the accountant who prepared the returns.

Although the Court is not unsympathetic as regards medical difficulties encountered by Mrs. Richardson, the record contains no evidence to corroborate any specifics regarding her illness or level of incapacity during the relevant 1996 to 1997 period. In fact, the record conflicts with any allegation that her involvement in HGAMC or HGRCT was materially curtailed. Furthermore, with respect to tax matters and reliance on a professional, the Court in other contexts and as previously explained has required the taxpayer to show, at minimum: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 99.

Here, a defense of justifiable reliance rings hollow in light of Mr. Graham's connection to the Aegis scheme and the complete absence of evidence to show that Mrs. Richardson made any attempt to review the returns in a meaningful way, ask questions, etc. After all, in light of Mrs. Richardson's extensive involvement, including attendance at the June 27, 1997, meeting addressing Notice 97-24, 1997-1 C.B. 409, and at a later section 6700 conference with the IRS, it is equally likely on the

record presented that she was well aware of and condoned the aggressive tax positions advocated by her husband and Mr. Graham.

On brief, petitioners repeatedly reference the quote: "Mere knowledge that the spouse has invested in a tax shelter resulting in substantial tax savings is accordingly, without more, insufficient to establish constructive knowledge of a substantial understatement". Friedman v. Commissioner, 53 F.3d 523, 531 (2d Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-549. The comparison simply is not apt. Not only is the premise factually distinguishable on the record before us revealing extensive involvement, the case is also legally distinguishable in that it addresses the standard in an erroneous deduction context and expressly highlights that different rules apply for an omission of income situation. Id. at 530. Furthermore, petitioners chose not to quote the court's statement that "an innocent spouse is one who despite having made reasonable efforts to investigate the accuracy of the joint return remains ignorant of its illegitimacy." Id. at 525. As just mentioned, the evidence here is silent on any such efforts.

On this record, petitioners have failed to establish that Mrs. Richardson did not have reason to know of the understatement. Accordingly, Mrs. Richardson is not entitled to relief under section 6015(b)(1), as the requisites of that provision are stated in the conjunctive. Nonetheless, for the

sake of completeness, a few comments are in order with respect to the remaining disputed element.

Section 6015(b)(1)(D) demands that, taking into account all facts and circumstances, it be inequitable to hold the requesting spouse liable for the deficiency. Here, however, the particulars of petitioners' situation recounted above do not persuade the Court that the necessary inequities would ensue from joint liability. Petitioners are still married and residing together, the record documents extensive involvement by Mrs. Richardson in the HGAMC and HGRCT arrangement, and both petitioners benefited jointly from the improvements in their financial status engendered by avoiding taxation on Mr. Richardson's personal service income and deducting personal expenses (including expenditures related to their residence, vehicles, healthcare, etc.) through HGAMC.

In this connection, petitioners ask us to hold in Mrs. Richardson's favor because she did not benefit beyond normal support, directly or indirectly, from the alleged understatement. The record, however, is bereft of evidence to support this contention. The documents chronicle the financial engineering just described, and petitioners have not offered any evidence pertaining to their lifestyle before or after implementation of the Aegis scheme to show that no attendant perks were realized thereby. Furthermore, all indications are that such attendant benefits would have been shared equally between the spouses.

Hence, the scenario at bar simply does not present the type of disadvantage and unfairness contemplated by the section 6015(b) criteria.  To reiterate, Mrs. Richardson does not qualify for relief from joint and several liability under section 6015(b)(1). As a final note, Mrs. Richardson does not seek equitable relief under section 6015(f).

To reflect the foregoing,

<u>Appropriate orders and decisions for respondent will be entered</u>.